Patrick HUGHES, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

Oct. 9, 1979.

William C. Wilson, Nashville, for petitioner.

William M. Leech, Jr., Atty. Gen., William O. Kelly, Asst. Atty. Gen., Elmer D. Davies, Jr., Dist. Atty. Gen., Douglas T. Bates, III, Asst. Dist. Atty. Gen., for respondent.

## OPINION

HENRY, Justice.

This is a search and seizure case arising under the Fourth Amendment to the Constitution of the United States and Article I, Section 7 of the Constitution of the State of Tennessee. More specifically it involves what has become known as a "stop and frisk" or *Terry* stop. Defendant was convicted of the possession of marijuana for the purpose of resale, with a sentence of eleven (11) months and twenty-nine (29) days plus a fine of $3,000.00. The Court of Criminal Appeals, in a split decision, affirmed the opinion. For the reasons discussed herein, we reverse.

## I.

### Procedural History

This is the second time this case has been before this Court. The petitioner and his

companion, Dale Neese, were originally convicted of possessing marijuana for the purpose of resale, and sentenced to imprisonment for not less than one nor more than three years and fined $1,000.00. The Court of Criminal Appeals held the search to be unlawful and reversed the conviction. We granted the State's petition and reversed the Court of Criminal Appeals, *State v. Hughes*, 544 S.W.2d 99 (Tenn.1976), on the basis of prejudicially inadmissible testimony.

We held that probable cause was shown by the testimony of the police officer that "he smelled the odor of marijuana coming from the vehicle when respondent Hughes lowered the window." Our opinion contained a significant footnote:

> 1. The officers claim that defendants consented to the search, a claim denied by them. We assume, but do not decide, that no consent was given. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
>
> If Hughes rolled down the window of his car in obedience to a demand from Officer Stafford that he exhibit his driver's license, a different question would be presented, because, under the circumstances existing, the officers, not being state patrolmen, had no authority to demand exhibition of such license since Hughes had not then or immediately prior thereto been engaged in a violation of any municipal ordinance or state statute. T.C.A. § 59–709; *Cox v. State*, 181 Tenn. 344, 181 S.W.2d 338 (1944); *Robertson v. State*, 184 Tenn. 277, 198 S.W.2d 633 (1947). However, this point was not fully developed at the hearing and our conclusion from the evidence is that Hughes parked his car voluntarily and then rolled down his window permitting the odor of marijuana to escape before Officer Staf-

ford demanded to see his driver's license. 544 S.W.2d at 101, fn. 1.

Thus, we specifically reserved the issue of the circumstances surrounding the lowering of the window.[1]

Because of the admission of irrelevant and prejudicial proof and because the circumstances under which the window was rolled down were "not fully developed at the hearing," we remanded for a new trial. Hence, the case is now before us on the record of that trial—and that trial alone— and only as to the petitioner. The Trial Judge sustained a motion for an acquittal as to *Neese*.

## II.

### *The Factual Background*

#### a. *General*

Shortly before midnight on 22 January 1973, Hughes and Neese, at the time young students at Middle Tennessee State University, drove to the Country Store. This establishment is a combination grocery store and restaurant.

The Volkswagon automobile in which they were riding was driven by Neese and owned by his father. Upon arrival Neese went into the store and asked the proprietor, Wilson Herbert, if it was still open. Upon receiving an affirmative reply, he returned to the automobile and spoke briefly with Hughes.

Hughes "scooted" over to the driver's side and drove away.[2] Neese returned to the store where he bought some eat-a-snacks and a coca-cola. While consuming them he first read magazines at the magazine rack, after which he apparently wandered aimlessly about the store.

---

1. At the suppression hearing on remand the Trial Judge declined to address this issue, merely noting that "it was controverted as to whether the window was . . . down or up," a finding that is more characterized by its brevity than its enlightenment.

2. There is a discrepancy between the statements of Hughes and Neese to the police officer with respect to the purpose of the trip. The officer says that Neese told him that he and Hughes were going to Florida; that they had had motor trouble; and that Hughes had a friend who could repair it. According to the officer, Hughes told him he went to see about a Blazer that was mired up in the mud and that he was on his way back to Murfreesboro.

## b. *The Information*

The proprietor, strangely enough, did not testify at the suppression hearing; however, at trial he outlined Neese's actions, all of which appeared to be consistent with the activities of a person waiting at a mercantile establishment for the expected return of a friend. We are not concerned, however, so much with what Neese did while in the store as what information was given by the proprietor to the police officer. It is on the basis of this information that this Court must determine whether the subsequent *Terry* stop was supported by "specific and articulable facts" or whether the officer acted upon a "mere hunch."

Captain Jimmy Stafford, of the Franklin Police Department, received the call from storeowner Herbert and was the principal figure[3] in the resulting investigation, search and seizure. According to his testimony at the suppression hearing Mr. Herbert:

advised that there was a car that had pulled up—Volkswagon had pulled up and there was a young man that had gotten out from under the driver's side and that another person in the car got under the wheel and drove off and that this man had gotten out, had come in the store and was acting *a little strange or suspicious*,[4] that he would like for us to come out and check on it. (Emphasis supplied).

At the trial Captain Stafford phrased it thusly:

Mr. Herbert advised me on the telephone that he had a young fellow in the store that he was *a little suspicious of* and wanted me to come out and check it out and see what he was up to . . . Mr. Herbert stated that a car had pulled up, a Volkswagon, pulled up and the driver got out and came into the store and the other person in the car got under the wheel and

drove off and proceeded out the interstate. (Emphasis supplied).

This is the *sole* information upon which the police acted. There is no proof that the police officers knew the proprietor or that he was reliable. There is no indication that his establishment was located in a high crime area and none that any crime had been committed or was about to be committed. Herbert advised *of no specific fact* that would constitute "strange or suspicious" conduct. And it must be borne in mind that Neese was in a public business during the hours it was open to the public.[5]

In fact, the proprietor admitted on cross-examination, by affirmative response, that "the main cause of apprehension of course was the lateness of the night of his arrival and the fact that it was closing time . . ." He reiterated that Neese did nothing unlawful.

## c. *The Seizure of Neese*

■ When the officers arrived at the Country Store, Neese was still inside. They asked him to step outside, identified him by checking his driver's license and "invited" him to sit in the rear seat of the patrol car. They did not consider him to be under arrest or that he was being detained; however, it is undisputed that the doors had no inside handles or latches, could not be opened from the back seat and one could only leave the car with assistance from someone on the outside. The police, of course, say that Neese "could have walked off" if he wanted to; however, when asked what his reaction would have been had Neese tried to leave, the officer's response was "I don't know." From these facts we find that Neese was in custody. He had been accosted and restrained of his liberty. Therefore, he had been "seized" under the Fourth Amendment. See Section III, *infra*.

---

3. His officer companion died between the two trials. No effort was made to introduce his former testimony.

4. The proprietor, neither at the trial nor the suppression hearing, detailed any strange or suspicious conduct.

5. The Trial Judge, after the suppression hearing, stated that "the proprietor of the Country Store became suspicious of Defendant Neese for reasons which need not be gone into." A more accurate phrase would have been, "for reasons that were never given."

While Neese was being detained a radio check was made by the officers and it was determined that he had no criminal record. Thus, the officers knew that as to Neese, there was nothing in his background to suggest participation in any criminal activity, nor did the information indicate any threatened or actual criminal conduct. As to Hughes, it is significant, if not critical to this inquiry, to note that there was no information from any source that implicated him in any criminal activity, or even any suspicious circumstances—at any time prior to his seizure.

Neese was kept in the back seat of the car at all times. After they had identified and questioned him, without *Miranda* warning or other advice with respect to his constitutional rights, the police, with Neese still in the back seat, drove toward the interstate looking for Hughes, who was observed as he drove up the ramp leading from Interstate 65.

d. *The Searches and Seizure of Hughes*

Hughes drove voluntarily to the Country Store and parked in front. The officers followed and parked alongside. Captain Stafford approached the automobile and Hughes rolled down the window, under circumstances that we fully expected the Trial Judge to determine on remand.

Hughes testified that he was directed to roll down the window. It is his testimony that at the time Captain Stafford approached the car the windows were all up, the night being cold; that the Captain asked for his driver's license and that he had to roll the window down in order to comply.

Neese testified that the Captain directed the window be rolled down by making a circular or rotating motion with his hand and forearm.

Captain Stafford's testimony is somewhat less than helpful. He admits asking for Hughes' driver's license, and that the window was up at the time. First he denied asking Hughes to roll down the window. When asked if he made any movement indicating that he wanted it rolled down, his response was:

*I don't recall it.* I don't recall doing anything like that, no sir. (Emphasis supplied)

\* \* \* \* \* \*

The best I can recall it seems as though as I walked up to the car itself and—the window was *possibly* being rolled down at that time. (Emphasis supplied).

At another place he said he asked for Hughes' driver's license after the window was coming down. Again, he testified: *I don't recall whether the window was being rolled down prior to my asking.* . . . (Emphasis supplied).

Immediately thereafter he testified that it all happened "within the same instant."

This question and answer followed:

Q. . . . and it could be that you asked for the driver's license and he rolled the window down in response to it, isn't that true?

A. It's possible.

Again:

Q. . . . he could have very easily rolled the window down after you asked for the driver's license, couldn't he?

A. Yes, sir.

\* \* \* \* \* \*

Q. Well, as the window was being rolled down, at that point had you asked to see his driver's license?

A. The best I recall he asked him for the driver's license—*I just honestly can't say whether the window was up or down.* (Emphasis supplied).

\* \* \* \* \* \*

Q. Did you make a motion—and I would like for you to think about this—did you make a motion with your hands in a circular fashion.

A. *I could have—I just don't recall.* (Emphasis supplied).

The testimony on this material issue leaves much to be desired. It was the nebulous nature of the proof as to this aspect of the case on the first trial, that, in part,

prompted our remand. The Trial Judge made no finding. See footnote 1, *supra.* The Court of Criminal Appeals took the position that "the officer did not infringe on Hughes' rights when he smelled the escaping marijuana,[6] regardless of when Hughes rolled down the window. We disagree; this conclusion not only overlooks the significance our former opinion placed on the reasons prompting the window to be rolled down, but also sidesteps the critical inquiry relating to the officer's right to approach the Hughes' vehicle in the first instance. At no time, had anyone pointed the finger of suspicion at Hughes and, as the officer stated, "I seen him do nothing."

It is a familiar rule of law in Tennessee jurisprudence that "contradictory statements of a witness in connection with the same fact have the result of 'cancelling each other out.' " *Taylor v. Nashville Banner Pub. Co.,* 573 S.W.2d 476, 482 (Tenn.Ct. App.1978). Perhaps the leading case is *Johnston v. Cincinnati, N. O. & T. P. Ry. Co.,* 146 Tenn. 135, 240 S.W. 429 (1921). There the Court speaking through Mr. Special Justice Trabue, stated the rule thusly:

> The question here is not one of the credibility of a witness or the weight of the evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies; but if the proof of a fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way. 146 Tenn. at 158, 240 S.W. at 436.

The "wishy washy" nature of the officer's testimony leaves the issue clouded. If it be established that Hughes rolled the window down voluntarily, it must be upon the officer's testimony. Hughes testified that he

was directed to roll down the window in that when the officer asked for his driver's license he had to roll down the window [or alight which has the same legal significance] in order to comply. Neese testified that the officer directed that the window be rolled down by making a circular motion with a hand and arm. The testimony of the officer is self-emasculating; it does not establish a voluntary lowering of the window.

Moreover, the burden of proof lies heavily upon the State to establish that the window was rolled down voluntarily and the vehicle *then* exposed *to* the officer's view and sense of smell. This follows because we are dealing with an exception to the search warrant requirements of the Fourth Amendment and the burden of proving voluntariness lies upon the State. "The burden is on those seeking the exemption to show the need for it." *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971). *See also, Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Additionally, the element of voluntariness is a part of the State's case and, like all other necessary elements, must be established by the prosecution. We hold that the proof does not establish that the window was rolled down voluntarily.

We would be entirely justified in reverting to our initial holding that the officer had no authority to demand exhibition of a driver's license, under Sec. 59–709, T.C.A., and if the window was rolled down pursuant to demand for such exhibition, "a different question would be presented." Having now held that the window was not rolled down voluntarily, we would be wholly warranted in finding that all else that transpired constituted an unwarranted intrusion and an infringement upon the personal security and liberty of a citizen. Instead we prefer to rest our decision, under all the facts and circumstances as developed on the second trial, on Fourth Amendment

---

**6.** The officer testified that he smelled burning marijuana after the window was lowered. This prompted the search of the automobile and the discovery of the contraband upon which the prosecution was based.

considerations, divorced from the narrow proposition of the entitlement of the police officer to demand the production of a driver's license.[7]

## III.

### The "Stop and Frisk" Cases

The first articulation by the Supreme Court of the United States of the "stop and frisk" exception to the traditional requirement of probable cause as a condition of conducting a search came in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The *Terry* fact scenario is familiar. Officer McFadden, a longtime Cleveland police officer, was patrolling the streets of downtown Cleveland. He was alone and all events occurred during daylight hours. Two men standing on a street corner attracted his attention and he placed them under surveillance. One of these men left the other and walked down the street past several stores, pausing to look in a particular store window. He then continued along the street, turned around and again stopped at the same store window. Thereafter, he rejoined his companion and the two talked briefly. Then the second man went through the same motions. This ritual was repeated by the two men alternately some five or six times each. After the two men had been observed "pacing, peering, and conferring," they walked off together in the direction taken by a third man who had previously engaged them in conversation. Officer McFadden, suspecting that they were "casing a job, a stick-up," followed them until they stopped in front of a store to talk to the same man who had conferred with them earlier. He then approached the three men, identified himself as a police officer and asked for their names.

The Court recognizes at the very outset that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. at 16, 88 S.Ct. at 1877, 20 L.Ed.2d at 903.

Further, the danger of the argument which attempts to distinguish between a "stop" and an "arrest" or "seizure," "seeks to isolate from constitutional scrutiny the *initial stages of the contact* between the policeman and the citizen." (Emphasis supplied) 392 U.S. at 17, 88 S.Ct. at 1878, 20 L.Ed.2d at 903. Thus, the Fourth Amendment comes into play irrespective of the nature or nomenclature of the intrusion. Therefore, officer McFadden "seized" Terry and "subjected him to a search." 392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. Thus, the Court determined that its dual inquiry was "whether the officer's action was justified *at its inception* and whether it was reasonably related in scope to the circumstances which *justified the interference in the first place.*" (Emphasis supplied) 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.

With this predicate, and after making it clear that the notions which underlie both the warrant procedure and the requirement of probable cause remain valid, the Court laid down a balancing test:

> [I]t is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." (citations omitted) And in justifying the particular intrusion the police officer must be able to point to specific and *articulable facts* which, taken together with rational inferences from those facts, *reasonably* warrant that intrusion. [18] The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.

---

7. We do not consider it either necessary or appropriate to discuss the remaining facts, in view of the conclusion we reach in Section IV, *infra.*

And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? (citations omitted) Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than *inarticulable hunches*, a result this Court has consistently refused to sanction. (citations omitted) And simple "good faith on the part of the arresting officer is not enough." (Emphasis supplied). 392 U.S. at 21, 22, 88 S.Ct. at 1879, 1880, 20 L.Ed.2d at 905, 906.

Footnote 18 reminds that:

This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.

Conceding the right of a police officer to search for weapons in the absence of probable cause to arrest, the Court restricts and circumscribes that right:

[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of a police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

Thus, the "frisk" of Terry was upheld on the basis of the officer's reasonable belief that "criminal activity may be afoot" and that Terry "may be armed and presently dangerous."

Mr. Justice Harlan's concurring opinion is of significance, especially under the facts of the case under consideration:

[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer *must first have constitutional grounds to insist on an encounter*, to make a forcible stop. . . . If and when a policeman has a right instead to disarm such a person for his own protection, he must first have *a right not to avoid him* but to be in his presence. (Emphasis supplied).

\* \* \* \* \* \*

Officer McFadden's right to interrupt Terry's freedom of movement and invade his privacy arose only because circumstances warranted forcing an encounter with Terry in an effort to prevent or investigate a crime. 392 U.S. at 32, 34, 88 S.Ct. at 1886, 20 L.Ed.2d at 912, 913.

■ Thus, in the context of a "stop and frisk" situation, the Court freed Fourth Amendment analysis from the rigidity of the probable cause standard but in so doing it imposed a standard of specific and articulable facts. The detection and prevention of crime and the safety of the officer are balanced against the nature and extent of and the reasons for the intrusion.

■ While *Terry* has been eroded somewhat and its holding has been enlarged to encompass other factual situations, it continues to be solid authority for these propositions:

a. that whenever an officer accosts an individual and restrains his liberty to walk away there has been a "seizure" under the Fourth Amendment;

b. that Fourth Amendment principles govern "stop and frisk" cases;

c. that in justifying a "stop and frisk", the officer must be able to point out (and on trial the state must prove) specific and articulable facts reasonably warranting the intrusion;

d. that the initial confrontation must be valid;

e. that the officer's action must be justified at its inception.

The Supreme Court released the companion case of *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), on the same date as the release of *Terry*.

Officer Martin, while in uniform and patrolling his beat, observed Sibron for an eight-hour period ending at midnight. During this period he saw Sibron in conversation with six or eight persons known by the

officer to be drug addicts. He heard nothing nor did he see anything pass between Sibron and any of the others. Late in the evening the officer saw Sibron enter a restaurant and speak with three more known addicts, but he overheard nothing and saw nothing pass. As Sibron was eating, Officer Martin approached him and ordered him outside. Once outside the officer told him, "You know what I am after." Sibron mumbled something and reached in his pocket. Simultaneously, the officer thrust his hand into the same pocket thereby discovering heroin.

Citing *Terry,* the Court said:

The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. 392 U.S. at 64, 88 S.Ct. at 1903, 20 L.Ed.2d at 935.

Justice Harlan, in a relevant and significant concurring opinion, held that a frisk is not to be permitted "[i]f the nature of the suspected offense creates no reasonable apprehension for the officer's safety . . . unless other circumstances [do]." 392 U.S. at 74, 88 S.Ct. at 1907, 20 L.Ed.2d at 941. This is essentially what the Court held in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Terry* was substantially expanded in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

The *Terry* stop rested upon the personal knowledge of the officer; in *Adams,* the basis was a tip by a person known to the officer and who had supplied information in the past, which the Court held had sufficient "indicia of reliability to justify the officer's forcible stop of Williams," even if not enough to justify a search warrant. 407 U.S. at 147, 92 S.Ct. at 1924, 32 L.Ed.2d at 617. In *Terry* the suspected criminal

activity was preparation for an armed robbery; here it was a mere possessory offense. In *Terry* the pat-down was validated on the basis of a founded fear of the possession of weapons; here, again, it was a possessory offense with no suspicion that defendant was going armed.

In *Adams,* the facts were that a lone police officer was on patrol duty in a high crime area, when a person known to him approached the cruiser with information that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. The officer went to the parked car, tapped on the window and asked the occupant to open the door. When Williams, the occupant, rolled down the window instead, the officer reached into the car and removed a loaded revolver from Williams' waistband. The gun was not in plain view, but it was where the informant had indicated. The tip was reliable. Williams was arrested for unlawful possession of a handgun. A search made incident to the arrest revealed substantial quantities of heroin and other contraband.

The Court held that the pistol was discovered as a result of a limited intrusion designed to insure the officer's safety. The Court said:

The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is *armed and presently dangerous* to the officer or others," he may conduct a limited protective search for concealed weapons. (citation omitted) The purpose of this limited search is *not to discover evidence of crime,* but to allow the officer to *pursue his investigation without fear of violence,* and thus the frisk for weapons might be equally necessary and reasonable . .. *So long as the officer is entitled to* believe that the suspect is *armed and dangerous,* he may conduct a *weapons search* limited in scope to this protective pur-

pose. (Emphasis supplied). 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617.

■ Thus the *Adams* court makes it clear that the right to frisk depends upon the validity of the investigative stop, and an investigative stop is permissible whenever an officer has reasonable suspicion supported by specific and articulable facts. An officer may not frisk unless the initial stop was justified.

While the validity of border searches is governed in substantial part by rules relating to a highly specialized law enforcement activity, the case of *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), is both relevant and significant.

Two officers of the Border Patrol were observing northbound traffic from a point south of San Clemente, about 65 miles from the Mexican border. The road was dark and they were illuminating passing cars with the headlights of the patrol car. They pursued and stopped a vehicle containing three occupants who "appeared to be of Mexican [descent]." Upon questioning it developed that two of the passengers were aliens who had entered the country illegally. Brignoni-Ponce was charged with the transportation of illegal immigrants under applicable federal law.

Respondent was convicted; however, on appeal the Circuit Court of Appeals for the Ninth Circuit held that the Fourth Amendment forbids stopping a vehicle, even for the limited purpose of questioning its occupants, unless the officers have a "founded suspicion" that the occupants are aliens illegally in this country. Founded suspicion could not be supported solely by Mexican ancestry.

The Supreme Court, on certiorari, held that under the Fourth Amendment, except at the border and its functional equivalents, officers could stop vehicles only if they were aware of specific articulable facts, together with rational inferences therefrom, that reasonably warranted suspicion of illegal entry. Because the intrusion fell outside the border search exemption the Court applied the conventional rules mandated by the Fourth Amendment.

The Court held that the border patrol could not make random vehicle stops for illegal aliens but must have a factual basis for such stops. Thus, the Court adhered to the reasonable suspicion—specific and articulable facts standard of *Terry-Adams*.

The Court reiterated the teachings of *Terry* that "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," 422 U.S. at 878, 95 S.Ct. at 2578, 45 L.Ed.2d 614, and Fourth Amendment constraints require that "the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. 422 U.S. at 878, 95 S.Ct. at 2579, 45 L.Ed.2d at 614–615.

Foreshadowing the subsequent holding of the Court, in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court specifically held that a stop on a random basis by the Border Patrol, even though the stop is "modest, we conclude that it is not 'reasonable' under the Fourth Amendment." 422 U.S. at 883, 95 S.Ct. at 2581, 45 L.Ed.2d at 618.

Thereafter, the Court held:

Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of *specific articulable facts*, together with rational inferences from those facts, that *reasonably warrant suspicion* that the vehicle contain aliens who may be illegally in the country. 422 U.S. at 884, 95 S.Ct. at 2582, 45 L.Ed.2d at 618.

■ The *Terry* opinion has been criticized for its failure to formulate guidelines governing the announced standard and more particularly, for not amplifying upon the concept of "reasonable suspicion." The Court, in *Brignoni-Ponce* extended the *Terry* doctrine to the stop of automobiles, and partially filled the void left by *Terry*. Among the factors which go to determine the existence of reasonable suspicion, in vehicular stop cases, are the characteristics of the area, the driver's behavior, the aspects

of the vehicle itself, an extraordinarily large number of passengers and their actions; "the officer is entitled to assess to the facts in light of his experience in detecting illegal entry and smuggling."

The *Terry* doctrine was substantially expanded in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). There the Court held in a *Per Curiam* opinion, reflecting the view of six members of the Court, that when an automobile is lawfully stopped for a traffic violation, the motorist may be required to alight from the car, even though the officer had no reason to suspect foul play at the time of the stop.

Two police officers on routine patrol observed Mimms driving a vehicle on an expired license plate. After stopping him for the purpose of issuing a traffic summons, he was ordered to get out and produce his owner's card and driver's license. After he had done so the officers noticed a large bulge under his short jacket. Fearing that he was armed, he was frisked and a loaded .38 caliber pistol was discovered. This prosecution ensued.

Mimms contended that the search was unconstitutionally infirm because the officers could point to no "objective observable facts to support a suspicion that criminal activity was afoot or that the occupants of the vehicle posed a threat to police safety." 434 U.S. at 108, 98 S.Ct. at 332, 54 L.Ed.2d at 335.

The Court noted that the initial intrusion on freedom of movement—the stop—was not questioned; therefore, the Court dealt only with "the narrow question of whether the order to get out of the car, issued *after the driver was lawfully detained,* was reasonable . . . ." 434 U.S. at 109, 98 S.Ct. at 332, 54 L.Ed.2d at 336. (Emphasis supplied).

The Court held the State's justification based upon the safety of the officer was both "legitimate and weighty." The Fourth Amendment was not violated; the search, or pat-down, was justified under *Terry.* It also stated that "we do not hold today 'that whenever an officer has an occasion to speak with the driver of a vehicle,

he may also order the driver out of the car.' " See footnote 6, 434 U.S. at 111, 98 S.Ct. at 333, n. 6, 54 L.Ed.2d at 337.

It must be kept in mind that the initial intrusion or restriction was admittedly lawful under the facts of this case. The patdown was permissible under the "armed and presently dangerous" doctrine of *Terry.*

We note next the recent and highly significant case of *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), in which the Supreme Court of the United States condemned random stops. *Prouse* was decided after the former decision of this Court in the instant case and after the most recent decision of the Court of Criminal Appeals.

A patrolman stopped an automobile occupied by Prouse, for the purpose of checking the license of the driver and the registration of the car. He had observed no violation and no suspicious activity. As he was walking toward the stopped vehicle, the officer smelled marijuana smoke; subsequently, he seized marijuana in plain view on the car floor.

The trial court suppressed the evidence; the Delaware Supreme Court affirmed; the Supreme Court granted certiorari, heard argument and affirmed.

We note, in passing, that this is a substantially stronger case for the prosecution than the case at bar, for, in *Prouse,* the contraband was in plain view.

The crux of the Court's holding is as follows:

[E]xcept in those situations in which there is at least *articulable and reasonable* suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. (Emphasis supplied). 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673.

Thus, the *Terry* doctrine of specific and articulable facts giving rise to reasonable suspicion continues to be applied.

Lastly, we note the highly significant case of *Brown v. Texas,* —— U.S. ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The opinion in this case was released after we heard argument in the case at bar. We think *Brown* is controlling on the issues presented in the case *sub judice.*

Two El Paso police officers observed Brown and another man walking in opposite directions away from one another in an alley, in an area marked by a high incidence of drug traffic. The officers believed, under the circumstances which they branded as "suspicious," that the two men had been together or were about to meet until the patrol car appeared. One of the officers got out and asked Brown to identify himself and explain what he was doing there. Brown refused to identify himself and angrily asserted that the officers had no right to stop him. They then frisked him and found nothing. Upon his continued refusal to identify himself, he was arrested and charged under a Texas statute making it unlawful for a person to refuse to give his name and address upon request of an officer who has lawfully arrested him. A search made after the arrest revealed nothing.

Brown was convicted in municipal court. Upon appeal to the County Court of El Paso County, he was again convicted and fined $45.00 and the court costs. This judgment, being for a fine not exceeding $100.00, was not appealable. Appeal was taken from the County Court to the Supreme Court of the United States, which noted probable jurisdiction and reversed.

To the case at bar the opening language of the discussion of the legal issues is of critical import:

When the officers detained appellant for the purpose of requiring him to identify himself, they performed a *seizure of his person* subject to the requirements of the Fourth Amendment. In convicting appellant, the County Court necessarily found as a matter of fact that the offi-

cers "lawfully stopped" appellant. (citation omitted) The Fourth Amendment, of course, applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi,* 394 U.S. 721, [89 S.Ct. 1394, 22 L.Ed.2d 676] (1969); *Terry v. Ohio,* 392 U.S. 1, 16–19, [88 S.Ct. 1868, 1877, 20 L.Ed.2d 889] (1968). '[W]henever a police officer *accosts an individual and restrains his freedom to walk away,* he has "seized" that person,' *id.,* at 16, [88 S.Ct. at 1877] and the Fourth Amendment requires that the seizure be 'reasonable.'" *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] (1975). (Emphasis supplied). 99 S.Ct. at 2640.

Citing *Delaware v. Prouse, supra, United States v. Brignoni-Ponce, supra,* and *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court said:

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to *arbitrary invasions solely at the unfettered discretion of officers in the field.* (citations omitted) To this end, the Fourth Amendment requires that a seizure must be based on *specific, objective facts* indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. (Emphasis supplied). 99 S.Ct. at 2640.

The State contended that Brown was stopped because the officers had a "reasonable, articulable suspicion that a crime had just been, was being, or was about to be committed." After noting the requirement that "officers . . . have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity," the Court said:

The flaw in the State's case is that none of the circumstances preceding the offi-

cer's detention of appellant justified a reasonable suspicion that he was involved in criminal conduct. . . . There is no indication in the record that it was unusual for people to be in the alley. The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood. 99 S.Ct. at 2641.

Again this is a substantially stronger case for the prosecution than the case at bar.

Finally, we point out that no search or frisk "unlawful at its inception may be validated by what it turns up." *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441, 453 (1963).

## IV.

### Conclusion

We apply these principles to the case at bar.

We view the activities of Neese and Hughes as being inseparable for purposes of adjudicating the Fourth Amendment rights of Hughes.

 Neese was accosted in the Country Store on the basis of information which contained no specific and articulable facts or inferences from facts, sufficient to generate a reasonable conclusion that a crime had been, was, or was about to be committed.[8] At maximum the information was a wholly subjective and inarticulate hunch. It completely fails the test of objectivity. He was restrained of his liberty to walk away and, thus, was subjected to an invalid seizure under the Fourth Amendment.

This carries over to invalidate the subsequent search and seizure of Hughes. The Hughes activities were merely a continuation of a forbidden intrusion and, in no sense, may they be isolated or may they be treated as a second and unrelated transaction. The wholly unwarranted deprivation of Neese's liberty was the initial intrusion that tainted the entire episode culminating in the confrontation with Hughes and the search of the automobile.

If we isolate the events surrounding the Hughes episode and analyze them separate and apart as opposed to treating them as the culmination of a progression of the investigation, the results are the same.

There is not the slightest suggestion in the record that Hughes had violated, was violating, or was about to violate any law. None of the criteria of *Delaware v. Prouse, supra*, was present to cause him to be brought under scrutiny. He was not in a high crime area; there was nothing in his behavior to suggest law violation; the officers had not seen any traffic violations; and there was nothing about the vehicle to incite suspicion.

As Judge Daughtrey phrased it in dissent:

> Thus, the controlling question is whether the officer had a constitutionally valid basis for making the original intrusion into the privacy of an individual who had given the officer absolutely no reason to suspect that he was engaged in any criminal activity.

The answer is evident; the intrusion was illegal and impermissible. As held in *Brown v. Texas, supra*, "none of the circumstances preceding the officers' detention justified a reasonable suspicion that he was involved in criminal conduct." 99 S.Ct. at 2641.

 The question of whether Hughes gave his consent to the search of his automobile is of no significance. The consent, if given, was subsequent to the initial wrongful intrusion. Just as there was an unconstitutional seizure when the El Paso officers stopped Brown in an alley and required him to identify himself in the absence of specific

---

8. There is no indication that it was unusual for people to be in the store during the hours it was open for public business. His action was no different from the activity of the normal patron in a grocery store and restaurant. *See Brown v. Texas, supra*, for similar language applied to an analogous situation.

objective facts, so it was constitutionally impermissible for the officers to approach Hughes and demand his driver's license. A citizen has a constitutionally ordered right to be secure in his person and possessions and to be free from "arbitrary invasions solely at the unfettered discretion" of the police.

The search or frisk was unlawful in its inception; the initial confrontation of Neese was constitutionally impermissible; and the deprivation suffered by Hughes, either on a derivative or direct and personal basis are on the same footing.

The judgment of the Court of Criminal Appeals is reversed and this action is dismissed.

Reversed and Dismissed.

BROCK, C. J., and FONES, J., concur.

COOPER and HARBISON, JJ., concur in results only.