# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE v. DONALD CURTIS REID

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-B-1101  J. Randall Wyatt, Jr., Judge**

---

**01C01-9903-CR-00077**
**No. M1999-00058-CCA-R3-CD - Decided April 28, 2000**

---

The defendant, Donald Curtis Reid, was convicted of aggravated robbery in connection with the holdup of a Nashville Burger King and sentenced to nine years in the Tennessee Department of Correction.  In this appeal, the defendant asserts that the trial court committed error by admitting evidence seized from his vehicle pursuant to a traffic stop and subsequent arrest for driving on a suspended license.  He also contends that the evidence was insufficient and that the sentence was excessive.  We find that the search of the defendant's vehicle was proper and that the evidence obtained as a result thereof was correctly admitted.  There being no error, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

WADE, P.J., delivered the opinion of the court, in which PEAY and OGLE, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Donald Curtis Reid.

Paul G. Summers, Attorney General & Reporter, Elizabeth T. Ryan, Assistant Attorney General, and D. Paul DeWitt, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Donald Reid, was convicted of aggravated robbery.  The trial court imposed a Range I sentence of nine years in the Tennessee Department of Correction.  In this appeal of right, the defendant presents the following issues for our review:

> (1)  whether the trial court erred by refusing to suppress evidence seized from the defendant's car at the time of his arrest;
>
> (2)  whether the evidence was sufficient to support a conviction of aggravated robbery; and
>
> (3)  whether the sentence was excessive.

We find no error and affirm the judgment of the trial court.

At 7:15 A.M. on December 26, 1996, Charles Sparkman, the manager of Burger King on Gallatin Road in Nashville, walked out of the restaurant restroom and was confronted by a masked individual who announced in a female voice, "This is a robbery." The individual then called the name, "Curtis," and a second masked individual, whom Sparkman believed to be a male, came out of the restaurant office armed with a weapon Sparkman described as a black pistol having a brown handle. The male robber directed Sparkman to the office to open the safe. The female took the money from the safe and put it in a bag. Sparkman estimated that the robbers took between $400.00 and $700.00, which included some wrapped coins. The two robbers then left the restaurant and drove away in what Sparkman described as a dark brown Oldsmobile or Buick, the same car he had seen earlier that morning in his parking lot. Sparkman then called the police.

Five days later, there was an armed robbery at Lee's Chicken on Gallatin Road. As the suspects fled the scene, a patrolman gave chase but was unable to make an arrest. A private citizen, who happened to be outside with his camera, took photographs of the suspects' brown Oldsmobile during the police chase. The private citizen turned the film into the authorities within thirty minutes of the pursuit. The photos showed that the vehicle used in the Lee's Chicken robbery was similar to the car used in the Burger King robbery, a two-tone "80's model Oldsmobile Delta 88 Royale" with a temporary tag in the windshield.

Seven days after the Lee's Chicken robbery, Metro Detective Norris Tarkington searched the East Nashville area for the vehicle used in the robberies. Near Stratford High School, he found a vehicle which matched the one in the photograph. Detective Tarkington learned that the same vehicle, which was driven by the defendant, had been stopped on December 4 because an officer believed the driver was "casing" West End Avenue for a possible holdup. The detective stopped the defendant for failing to make a turn signal. Marnita Roberson was a passenger in the defendant's vehicle at the time of the stop.

Detective Tarkington arrested the defendant for driving on a suspended license and searched the vehicle. When he looked in the passenger compartment, he found two pellet guns, a ski mask, some gloves, and coin wrappers for quarters and pennies. While the defendant acknowledged ownership of the vehicle, he denied owning the pellet guns.

Several weeks later, Ms. Roberson was arrested. After initially denying any involvement in the robberies, she acknowledged that she and the defendant had robbed the Burger King. The defendant was arrested for the Burger King robbery a few days after Ms. Roberson's confession.

Ms. Roberson appeared as a witness for the state at the trial of the defendant. She testified that she met the defendant, Donald Curtis Reid, through Elizabeth LeMay, who stayed with her, her three children, and her two sisters, in the Settle Court projects. She identified the defendant's car from the photograph of the vehicle pursued by the police after the Lee's Chicken robbery. Ms. Roberson confirmed that she was with the defendant when he was stopped in the West

End area in early December of 1996 and stated that she knew the defendant by his middle name of "Curtis." Ms. Roberson described his vehicle as a "beige or a tan Buick . . . a long car with tinted windows."

She recalled that in the early morning hours of December 26, 1996, she was with the defendant as he "was riding around . . . going [to] rob something and . . . looking at places and stuff." Ms. Roberson recalled that the two went into a Wal-Mart at Rivergate and purchased a BB gun. The defendant also acquired some gloves while at Wal-Mart. She testified that the two then saw the Burger King on Gallatin Road and the defendant decided to stop. The defendant went to the trunk and provided Ms. Roberson with a ski mask. He pulled a shirt sleeve with cut eye holes over his own head. Ms. Roberson testified that the defendant went into the office area when they found the restaurant empty and that she called for "Curtis" when the manager emerged from the restroom. She stated that the defendant forced the manager to open the safe and acknowledged that she held the bag while the manager placed the cash inside. Some of the cash included wrapped coins. Ms. Roberson testified that she received $200.00 from the robbery. She stated that she used some of the proceeds for illegal drugs and gave some to her children.

Ms. Roberson confirmed that she initially denied any involvement in the robbery but ultimately admitted her participation, not only in the Burger King robbery, but in others as well. Ms. Roberson conceded that she had committed other robberies with other men. She acknowledged that the defendant himself had been robbed at her apartment just prior to the Burger King robbery by a person she knew as "Mike Ike." Ms. Roberson denied having "set up" the robbery. She also denied having any romantic relationship with the defendant.

The defendant, who testified on his own behalf, stated that he stayed at Ms. Roberson's apartment for approximately three days in December of 1996. He recalled that while there, he was robbed at gunpoint by a person known to Ms. Roberson. The defendant claimed that Ms. Roberson had unsuccessfully attempted to recruit him into participating in a robbery. While he acknowledged having been with Ms. Roberson during late December of 1996 and recalled their trip to the Wal-Mart, he contended that it was Ms. Roberson who had stolen two BB pistols from the store. The defendant explained that he had purchased a two-tone Oldsmobile Delta 88 in early December of 1996 and that at the time of the purchase, there were two BB pistols and some compact discs in the trunk, those items found by police at the time of his arrest. The defendant contended that he had loaned Ms. Roberson his vehicle on three different occasions and implied that she would have had the opportunity to rob the Burger King with the help of someone else.

The defendant claimed that on December 25, 1996, he had gone to his parents' house and also visited with his aunt. He stated that he later went to the residence of Tonya Hill where he spent the night. He contended that he was not with Ms. Roberson at the time of the Burger King robbery and that he had slept until 1:00 or 2:00 P.M. on December 26. The defendant believed that Ms. Roberson had testified falsely against him because he had told her children's father about being robbed at her apartment. He believed he had been set up by Ms. Roberson and loaned her his vehicle afterwards only because he had compassion for her children. The defendant denied that Ms. Roberson ever referred to him as "Curtis" and claimed that she always referred to him as either

-3-

"Donnie" or "DQ."

I

Initially, while the defendant makes no complaint about the seizure of the vehicle and its use by the state as evidence, he does contend that the trial court erred by refusing to suppress the tangible evidence found in the passenger compartment and trunk of his vehicle immediately after the stop. He argues that he had broken no laws and was not acting suspiciously at the time, and that the detective had no reason to believe that the vehicle contained contraband. The defendant submits that the search of the vehicle cannot be justified as either incident to a lawful arrest or for inventory purposes. In response, the state contends that an investigative stop was warranted and that, upon learning that the defendant was driving on a suspended driver's license, the seizure of the two pellet pistols, a ski mask, and the other items were the consequence of a lawful search incident to an arrest for the license violation.

There was a separate hearing on the motion to suppress. Detective Tarkington testified that on the date of the arrest, he was looking for the vehicle that appeared in the photographs taken during the car chase after the Lee's Chicken robbery on December 31, 1996. The defendant's vehicle was a match. The photographs established that the vehicle had a temporary license tag in the upper left rear window. They also showed that there was some damage, "a small tear or wrinkle in the [tinted] rear window. . . ." Detective Tarkington had first seen the defendant's vehicle within a mile of the Lee's Chicken restaurant. He learned that the defendant, while driving that vehicle, had been stopped one month earlier on the suspicion that he was "casing" an area for a robbery. After stopping the defendant in the Stratford High School parking lot regarding the photographs of his Oldsmobile, Detective Tarkington learned that the defendant did not have a driver's license, arrested him, and searched the car.

At the conclusion of the hearing on the motion to suppress, the trial court determined that there was probable cause to arrest the defendant. The trial court determined that the detective was entitled to search the vehicle incident to the lawful arrest and that there was also a basis for arrest on a charge of driving on a revoked license. The trial court concluded that the search was reasonable based upon probable cause and the mobility of the vehicle.

In reviewing a determination made by the trial court upon a motion to suppress evidence, the findings of fact must be upheld unless the evidence preponderates otherwise. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our supreme court held as follows:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

-4-

Id. at 23. The application of the law to the facts as determined by the trial court is a question of law which requires de novo review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Whether there was an arrest is primarily a question of fact. State v. Crutcher, 989 S.W.2d 295 (Tenn. 1999).

The Fourth Amendment to the United States Constitution and art. I, § 7 of the Tennessee Constitution restrict official restraints on a person's liberty. There is a right to be free from unreasonable searches and seizures. The Fourth Amendment is applicable to the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

A warrantless search or seizure is presumed to be unreasonable unless the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997). Anytime an officer restrains an individual, the individual has been "seized" for constitutional interpretation purposes. Hughes v. State, 588 S.W.2d 296, 302 (Tenn. 1979). An exception to the warrant requirement is a contemporaneous police search following a lawful arrest. Chimel v. California, 395 U.S. 752, 762-63 (1969). The state has the burden of establishing by a preponderance of the evidence that the search and any seizure were justified pursuant to a recognized exception to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 445-55 (1971); Hughes v. State, 588 S.W.2d 296 (Tenn. 1979). A police officer who makes a lawful arrest is permitted, incident to the arrest, to search the defendant and the immediate surrounding area. Chimel, 395 U.S. at 763. One basis for the exception is that the officer must be allowed to take safety precautions before placing one under arrest. United States v. Robinson, 414 U.S. 218, 234 (1973). The same principle applies to arrests of occupants of vehicles. In New York v. Belton, 453 U.S. 454 (1981), the Supreme Court held as follows:

> [W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

453 U.S. at 460; see also United States v. White, 871 F.2d 41, 44 (6th Cir. 1989); State v. Reed, 634 S.W.2d 665, 666 (Tenn. Crim. App. 1982). Such an automobile search is permissible even when the arrested person has been placed into the back seat of a squad car. State v. Watkins, 827 S.W.2d 293, 296 (Tenn. 1992).

An arrest is the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." West v. State, 221 Tenn. 178, 184, 425 S.W.2d 602, 605 (1968) (citations omitted). An arrest may occur without formal words so long as there is no freedom of movement. 5 AmJur 2d Arrests, § 2 (1995); Crutcher, 989 S.W.2d at 301-302. A warrantless search may not precede an arrest and serve as part of its justification. Smith v. Ohio, 494 U.S. 541 (1990); Sibron v. New York, 392 U.S. 40, 63 (1968). A seizure implicating constitutional concerns occurs when, under the totality of the circumstances, a reasonable person would believe that he was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 574 (1988).

A full-scale arrest is one type of police intrusion; a stop is another. In order to support an investigatory stop, an officer need only establish reasonable suspicion supported by specific and articulable facts. State v. Foote, 631 S.W.2d 470, 472 (Tenn Crim. App. 1982). In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court acknowledged the differences between a search emanating from an investigative stop and a search incident to arrest. In the latter, the search is justified by both safety reasons and the need to prevent the disappearance or destruction of evidence. In the former, the sole justification for the intrusion "is the protection of the police officer and the others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Id. at 29. The ruling in Terry provides that the officer, when in reasonable fear of his or others' safety, has the authority to conduct "a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used against him." Id. at 30. The detention in an investigatory stop must be brief absent the discovery of any offense within the scope of the limited search. See Ybarra v. Illinois, 444 U.S. 85 (1979); State v. Yarbro, 618 S.W.2d 521 (Tenn. Crim. App. 1981). No search "unlawful at its inception may be validated by what it turns up." Wong Sun v. United States, 371 U.S. 471, 484 (1963).

In Carroll v. United States, 267 U.S. 132 (1925), the Supreme Court observed as follows:

> On reason and authority, the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.
>
> * * *
>
> [T]he guaranty of freedom from unreasonable searches and seizures . . . has been construed . . . as recognizing a necessary difference between a search of store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of an . . . automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

Id. at 149-153.

In Chambers v. Maroney, 399 U.S. 42 (1970), the high court saw "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a

magistrate and on the other hand carrying out an immediate search without a warrant." Id. at 52. Later, in Michigan v. Thomas, 458 U.S. 259 (1982), the Supreme Court held that "the justification to conduct . . . a warrantless search does not vanish once the car has been immobilized; nor does it depend upon the likelihood that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." Id. at 261.

In United States v. Ross, 456 U.S. 798 (1982), the Supreme Court reasoned that the "scope of a warrantless search based on probable cause is no narrower–and no broader–than the scope of a search authorized by a warrant supported by probable cause." Id. at 823. The court determined that the scope of a warrantless search would be "defined by the object of the search and the places in which there is probable cause to believe that it may be found." Id. at 824. In California v. Carney, 471 U.S. 386 (1985), the high court observed that the expectation of privacy with regard to an automobile is less than that for a home or an office.

Our supreme court, in State v. Leveye, 796 S.W.2d 948 (Tenn. 1990), adopted the rule in Carney. The reasons listed for the invocation of the vehicle exception to the warrant requirement included vehicular mobility, the reduced expectation of privacy, and that the automobile search was such that a magistrate would have authorized it. Id. at 951-52. If there is probable cause to search an entire vehicle, an officer's authority extends to the opening of closed containers. Ross, 456 U.S. at 821.

There may also be a warrantless inventory search. Citing South Dakota v. Opperman, 428 U.S. 364 (1976), our supreme court in Drinkard v. State, 584 S.W.2d 650 (Tenn. 1979), established the following guideline:

> [I]f the circumstances that bring the automobile to the attention of the police in the first place are such that the driver, even though arrested, is able to make his or her own arrangements for the custody of the vehicle, or if the vehicle can be parked and locked without obstructing traffic or endangering the public, the police should permit the action to be taken rather than impound the car against the will of the driver and then search it. Just cause to search the driver is not alone, enough; there must also be reasonable cause to take his vehicle into custody.

Id. at 653.

The burden is on the state to show that an impoundment was necessary, i.e., that there were reasonable grounds for the impoundment. Id. at 654. An "inventory search . . . is ostensibly to protect the occupant of the vehicle against loss of his property or the law enforcement agency against the occupant's claim for failure to guard against such loss." State v. Gaut, 357 So.2d 513, 516 (La. 1978).

In Drinkard, a passenger was available to take charge of the vehicle. In State v.

-7-

Roberge, 642 S.W.2d 716 (Tenn. 1982), our supreme held that when the circumstances justified an impoundment, the inventory search included the opening of unlocked containers, such as a duffle bag in that instance. Before an inventory search, the officer must advise the defendant that the car will be impounded unless he can provide a reasonable alternative. The extent of the consultation with the defendant is a factor to determine whether an impoundment is reasonable and necessary. State v. Lunsford, 655 S.W.2d 921 (Tenn. 1983). An inventory search must not be pretextual. State v. Glenn, 649 S.W.2d 584 (Tenn. 1983); State v. Cabage, 649 S.W.2d 589 (Tenn. 1983).

Here, the state argues that the evidence is admissible due to a search incident to arrest and a lawful inventory search. The defendant contends that the state's proof was inadequate to support the inventory search exception. The state suggests, however, that the stop of the defendant qualified as an investigatory stop based upon reasonable and articulable suspicions that the defendant's vehicle had been used in a robbery. The state argues that Detective Tarkington considered the totality of the circumstances, which included his own objective observations and information obtained from other police officers, and made rational inferences and deductions based on the facts and circumstances. Watkins, 827 S.W.2d 294. The state submits that when the defendant did not have a valid driver's license, Detective Tarkington made a custodial arrest and, therefore, had the full authority to search the passenger compartment of the motor vehicle contemporaneously with the arrest. At that point, of course, the detective found the pellet pistols, gloves, and a ski mask. A further search of the vehicle, including the trunk, yielded coin wrappers and clothing.

In our view, there was probable cause to seize the vehicle as that used in the Lee's Chicken robbery. In Horton v. California, 496 U.S. 128 (1990), the Supreme Court approved the seizure of a vehicle due to its potential evidentiary value, a question initially considered in Coolidge v. New Hampshire, 403 U.S. 443 (1971). Because the police had probable cause to believe that the car was an instrument of the crime and, therefore, evidence of the crime, the seizure was permissible. See United States v. Cooper, 949 F.2d 737 (5th Cir. 1991); Ex parte Payne, 683 So.2d 458 (Ala. 1996) (warrantless seizure of automobile lawful, as it "was in plain view, and the police had probable cause to believe that the automobile itself was evidence of the crimes"); see also Capraro v. Bunt, 44 F.3d 690 (8th Cir. 1995) ("Because a vehicle is subject to a warrantless search on probable cause if the vehicle contains evidence of crime, the vehicle should likewise be subject to a warrantless seizure if the vehicle itself is an instrument of crime."). Within 30 minutes of the robbery, a citizen provided police with film depicting the fleeing vehicle. The film was processed the same day. Detective Tarkington had 8 x 10 photographs which showed a rather unique 1984 Delta 88 Oldsmobile, tan in color and with a temporary tag in the back window. There was "a small tear or wrinkle in the window" which was documented in the photograph. The car seized and the car in the photograph appeared to be one and the same, "a clear indication of the appearance of the vehicle . . . [and the] temporary tag." At the time of the stop, the defendant was within a mile of the site of the robbery which had taken place approximately one week earlier. Detective Tarkington determined that the defendant, identified as "Donald Curtis Reid," was in a vehicle which had previously been stopped in the West End of Nashville under the suspicion that the occupant was "casing" an area for a robbery. There was a female passenger in the defendant's car. When the officer determined that the defendant owned the vehicle and had been in possession of the vehicle

since December 4, 1996, there was, in our view, probable cause to arrest the defendant for the Lee's Chicken robbery. Our assessment is that the warrantless search of the interior was proper as incident to the arrest. That pretermits any analysis under the inventory search exception or the investigative stop theory submitted by the state.

A custodial arrest may take place when there is probable cause to believe that a crime has been committed and that the suspect of that investigation committed the crime. The arrest of the defendant permitted a search of the immediate area within the vehicle, including the passenger area. As determined by the trial court, the defendant had been arrested at the time the interior search was instituted by the detective. There was a need, in our view, for the officer to prevent the destruction or loss of any possible evidence. See Crutcher, 989 S.W.2d at 301. The evidence does not preponderate against the trial court's conclusion that the defendant was placed under arrest and that, incident thereto, the officer made a reasonable search of the immediate area around the defendant. When the officer found the guns and ski mask in the glove compartment, it was entirely reasonable to extend the search to the trunk, where other incriminating evidence was found. It was incidental that Detective Tarkington conducted an inventory of the vehicle, had it towed to the Metro impound lot, and filed "seizure papers on the car."

II

Next, the defendant argues that the evidence was insufficient to support the conviction of aggravated robbery. In support of that contention, the defendant points out that the Burger King manager did not see the temporary tag in the back window of the robber's getaway vehicle. He contends that Ms. Roberson, who acknowledged her participation in several robberies and initially lied to the police regarding the Burger King robbery, was not a credible witness.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). In a criminal case, a conviction can be set aside only when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in testimony in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

Here, there was direct evidence that the defendant utilized a pellet gun to rob the manager of the Burger King. Clearly, there was proof to support each of the elements of the crime of aggravated robbery. Issues of credibility are for the jury. Here, the jury chose to accredit the testimony of Marnita Roberson and rejected the claims of the defendant. That was their prerogative. There was also corroborative proof of the defendant's guilt. The defendant's car matched the general description provided by the restaurant manager. A mask, guns, and gloves were found in his vehicle. That lent credence to the state's theory. In our view, a rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt. Thus, the evidence satisfies the standard prescribed in Tenn. R. App. P. 13(e) and <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).

## III

As his final issue, the defendant argues that his Range I sentence of nine years was excessive. He contends that because he had no prior criminal offenses, other than driving violations, the trial court should have imposed the minimum possible sentence. The defendant specifically contends that there were two mitigating circumstances:

> (1)     The defendant's criminal conduct neither caused nor threatened serious bodily injury; and

> (13)    the defendant had no significant criminal history and has never been convicted of a felony.

Tenn. Code Ann. §§ 40-35-113(1), (13). While acknowledging that the defendant had no other felony offenses, the trial court made reference to other robbery charges and rejected the defendant's claim that the offense had neither caused nor threatened serious bodily injury. The trial court concluded that there were two enhancement factors. That is, that the defendant was a leader in the commission of the offense and that the defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. §§ 40-35-114(2), (10). The state had also sought the application of Tenn. Code Ann. § 40-35-114(16):  The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a <u>de novo</u> review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991); <u>see</u> <u>State v. Jones</u>, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." <u>State v. Shelton</u>, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; <u>State v. Smith</u>, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The record in this case demonstrates that the trial court made adequate findings of fact.

In calculating the sentence for felony convictions committed before July 1, 1995, the

-10-

presumptive sentence is the minimum within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c) (1990) (amended July 1, 1995, to provide that the presumptive sentence for a Class A felony is the midpoint in the range). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the minimum. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210. The sentence may then be reduced within the range by any weight assigned to the mitigating factors present. Id.

The defendant, who was 24 years of age at the time of the sentencing hearing, dropped out of school in the tenth grade but received a graduate equivalent diploma in 1992. Other than a knee injury sustained in an accident in the jail, for which he required surgery, the defendant is in relatively good physical condition and has no history of alcohol or drug abuse. The defendant is single and has never married. He has a supportive family and a reasonably good work record. His only asset was a 1984 Delta 88 automobile which was confiscated after his arrest.

The trial court observed that the defendant had obtained the pistols from Wal-Mart, selected the robbery site, and ordered the manager to remove the monies from the safe. That, it ruled, established a role of leadership. We agree. There was risk of injury because the defendant brandished the weapon in close proximity to the manager and other employees who were in the restaurant. Both the manager and Ms. Roberson testified that there were as many as four other employees in the store at the time of the robbery. The general manager specifically named three of the individuals. Thus, the trial court reasoned, there was a high risk to the lives of others.

In State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995), this court recognized the principle that enhancement factors (10) and (16) are elements of the crime of aggravated robbery and cannot be utilized to enhance a sentence. Nevertheless, this court allowed for the application of Tenn. Code Ann. §§ 40-35-114(10), (16), where there were other people in a restaurant besides the victim. Each of the "factors may be applied in situations where individuals other than the victim are in the area and are subject to injury." Id.; see State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994).

In our view, the trial court did not err in the application of the two enhancement factors. Moreover, a third, Tenn. Code Ann. § 40-35-114(16), might have been applied. The trial court properly accepted one mitigating factor and properly rejected the other. Under these circumstances, the sentence of nine years is entirely appropriate.

Accordingly, the judgment is affirmed.