IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 26, 2006

## FARON DOUGLAS PIERCE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Blount County**
**No. C-15226     D. Kelly Thomas, Jr., Judge**

**No. E2005-01390-CCA-R3-PC - Filed October 13, 2006**

The Appellant, Faron Douglas Pierce, appeals the dismissal of his petition for post-conviction relief. Pierce was convicted of aggravated robbery by a Blount County jury and was sentenced to twenty years in the Department of Correction. On appeal, Pierce argues that he was denied his Sixth Amendment right to the effective assistance of counsel, specifically arguing that trial counsel was deficient in: (1) failing to seek suppression of evidence at trial; (2) failing to adequately inform Pierce of his right to testify at trial; and (3) calling a witness which prejudiced the defense. After review, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

Robert W. White, Maryville, Tennessee, for the Appellant, Faron Douglas Pierce.

Paul G. Summers, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; and Rocky H. Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### Factual Background

The facts of the case, as established on direct appeal, are as follows:

On the evening of October 25, 1996, the victim, Joseph Wayne Howe, was working at a Pilot convenience store located at West Broadway in Maryville, Tennessee. At approximately 9:30 p.m., two men wearing bandannas tied over their faces and armed with butcher knives entered the store. One of the men was wearing a red bandanna and a jacket in the team colors of the Washington Redskins; the other was wearing a blue bandanna and a dark jacket. The victim was the only employee in the store.

Wielding a 10-inch butcher knife, the robber in the blue bandanna demanded "all [the victim's] money." When the victim opened the cash drawer, the robber in the blue bandanna "took the whole till out of the register." He then demanded that the victim open the safe. When the safe was opened, the robber pushed the victim aside and removed the money, which consisted of change. The robber next demanded that the victim open the "hard side" of the safe. Although the victim was unable to open the "hard side," he saw an opportunity to disarm the robber and initiated a struggle. When the robber in the blue bandanna prevailed in the scuffle, he ordered the victim to lie down behind the register. The victim refused and was escorted at knife point to the store's office. Each of the robbers then struck the victim in the face. When the robber in the red bandanna left the office, the victim ran out of the store's front door and into the street, shouting for help. At that point, the victim saw a "light-green colored square-looking car" being driven to the front of the store. The two robbers got into the car and it sped away. The victim was unable to discern whether the driver of the car was male or female. Ultimately, the victim determined that the robbers had stolen cigarettes, money, checks, and credit card receipts.

After leaving the convenience store, the robbers fled to Mynders Avenue, approximately one mile away from the scene of the robbery. Jonathan Earl Hendricks, Sr., who was standing on the front porch of his residence, which is located on a dead-end street, saw the robbers' vehicle being driven at a high rate of speed. The vehicle turned around, proceeded back up the street, and entered the driveway at a residence next door to Hendricks, striking the bumper of a vehicle already in the driveway. When the vehicle was stopped, Hendricks saw two men and one woman inside. The vehicle was then quickly backed onto the street, where it struck a mailbox and came to rest in a ditch. The occupants remained inside the vehicle and Hendricks went to call the police from a pay phone. Upon his return, he saw several of his neighbors attempting to remove the vehicle from the ditch. The two male occupants of the vehicle ran toward the house next door, while the female occupant remained with the vehicle. Hendricks was able to identify one of the males, Ricky McBee, but did not know either the female or the other male, whom Hendricks described as wearing a dark leather or vinyl-type jacket.

Officer Eddie Davis of the Maryville Police Department was dispatched to the crime scene. Approximately 15 to 20 minutes after his arrival at the store, the officer was directed to investigate the traffic accident on the dead-end street. When he arrived at the scene of the accident, he observed that the vehicle in the ditch matched both the description and the license tag number of the robbery vehicle. Officer Davis ascertained that the vehicle belonged to Dawn Webb, who was standing in the yard of the house next door to Hendricks. After backup officers arrived, Officer Davis and Detective David Graves entered the house to search for suspects. A white male, Ricky McBee, was lying on a bed in the back bedroom. The

[Appellant] was discovered hiding under the same bed. McBee and the [Appellant] were then taken to the Pilot for identification by the victim. Because McBee's red bandanna had fallen off during the robbery, the victim was able to make a positive identification. The victim was unable to identify the [Appellant].

Although no identifiable fingerprints were obtained from the crime scene, a large quantity of physical evidence was found at the house in which McBee and the [Appellant] were discovered. Pilot receipts, coupons, checks made payable to Pilot, and coin wrappers were found in the driveway of the residence. Police found a brown vinyl jacket and a butcher knife on the porch. The jacket contained $22.50 in rolled coins and a cigarette lighter. A red and yellow jacket similar to a Washington Redskins jacket was found in the same back bedroom as McBee and the [Appellant]. Three cartons of Marlboro cigarettes, another butcher knife, and two rolls of pennies were in the suspect vehicle. Five packs of Marlboro cigarettes were recovered from Webb's purse.

When the [Appellant] was searched at the police station, $397.86, most of which was change, was found on his person. The bills were "wadded up," but were sorted by denomination. Police also recovered a Pilot receipt mixed in with the currency in the [Appellant's] pocket. A Pilot customer, Margaret Thurman, identified the receipt as one which she had signed earlier during the day when purchasing gasoline.

*State v. Faron Douglas Pierce*, No. E1999-02210-CCA-R3-CD (Tenn. Crim. App. at Knoxville, Nov. 15, 2000). Following a jury trial, the Appellant was convicted of aggravated robbery and sentenced to twenty years in the Department of Correction. A panel of this court affirmed the Appellant's conviction and sentence on direct appeal. *Id.*

On March 9, 2001, the Appellant filed a *pro se* petition for post-conviction relief seeking: (1) a delayed appeal to the supreme court based upon appellate counsel's failure to file a Rule 11 Application for Permission to Appeal following the affirmance of his conviction on direct appeal; and (2) a new trial as authorized by the Post-Conviction Procedure Act upon grounds that trial counsel was ineffective, as well as other constitutional grounds. A review of the case history reflects that no action was taken by the post-conviction court with regard to either the request for a delayed appeal or upon the claim of ineffectiveness. Moreover, the record does reflect that a timely Rule 11 application was filed to the supreme court in this case and was denied in May 2001. *State v. Faron Douglas Pierce*, No. E1999-02210-SC-R11-CD (Tenn., May 14, 2001).[1]

---

[1]The Appellant asserts that in July 2004, the Tennessee Supreme Court denied his Rule 11 application following the grant of a delayed appeal in this case. However, the appellate record does not support that a delayed appeal was ever granted. To add further confusion to the issue, trial counsel acknowledged at the post-conviction hearing that he failed to inform the Appellant of his right to a discretionary appeal and that a delayed appeal was granted. While we are unable to reconcile these allegations with the case history or appellate record, we note that in February 2005, this court did grant

(continued...)

On September 3, 2004, the Appellant refiled his original March 9, 2001 petition for post-conviction relief omitting that portion of the petition which sought a Rule 11 delayed appeal. Following the appointment of counsel, a hearing was held on April 14 and April 15, 2005, at which trial counsel, two police officers, and the Appellant testified. On appeal, the State contends that this court is without jurisdiction to consider the appeal because the September 3, 2004 petition was filed more than one year after the Appellant's conviction became final in May 2001. We disagree. The Appellant's petition, which was filed on September 3, 2004, merely reflects a refiling of his initial petition of March 9, 2001, which was not ruled upon by the post-conviction court.

At the post-conviction hearing, the Appellant testified that trial counsel did not allow him to testify at trial. According to the Appellant, he adamantly informed trial counsel that he wanted to testify in his own defense on multiple occasions despite the fact that the State would be allowed to impeach him with prior convictions. However, the Appellant related that he believed the decision of whether he could testify was ultimately to be made by trial counsel. Moreover, he contends that he was never informed of or waived his right to testify on the record. The Appellant also gave testimony relating to the Pilot receipt and money found in his pocket. He stated that he had cashed a check that day and had won the rest of the money playing poker. He related that the receipt was never in his pocket, inferring that Detective Graves had placed it there. The Appellant testified that he asked trial counsel to file a motion to suppress the receipt but that trial counsel refused.

In contrast, trial counsel testified that he had numerous discussions with the Appellant regarding his right to testify. At trial, counsel stated that he did advise the Appellant not to testify because doing so would allow the State to impeach him, but he made it clear to the Appellant that the decision to testify or not to testify belonged to the Appellant. According to trial counsel, the Appellant acquiesced to his advice not to take the stand. It was agreed that they would pursue a defense strategy that the Appellant was not present at the robbery, as the clerk could not identify him. Trial counsel stated that he called Captain Dan Neubert as a defense witness in order to introduce evidence of the Appellant's, as well as Ricky McBee's, height. Counsel stated he did this because the victim had testified that the robber whom he was unable to identify was taller and stockier than McBee. However, the Appellant and McBee were close in both height and weight. At trial, counsel alluded to the fact that R.L. Seaton could have possibly been the actual robber as his height was closer to that described by the clerk. However, the State recalled Neubert, who established through the admission of jail records, that Seaton was incarcerated at the time of the robbery. Although acknowledging that the receipt found in the Appellant's possession was extremely damaging evidence, trial counsel did not feel it appropriate to file a motion to suppress but rather to argue that there was a mixup regarding the receipt as the Appellant was not searched until he reached the police station.

[1](...continued)
a Rule 11 delayed appeal in a separate case following our affirmance of a robbery conviction from Knox County. That Rule 11 Application for Permission to Appeal was denied in June 2005.

After hearing the evidence presented, on May 16, 2005, the post-conviction court, by written order, denied the Appellant's petition. This appeal followed.

**Analysis**

On appeal, the Appellant raises the single issue of ineffective assistance of counsel. Specifically, he asserts that trial counsel was deficient in that: (1) he failed to file a motion to suppress items of evidence, including the Pilot receipt found in the Appellant's pocket following an unlawful arrest; (2) he failed to explain and clearly establish that the Appellant was aware of his right to testify or not testify at trial; and (3) he called a defense witness which prejudiced the Appellant's case. To succeed on a challenge of ineffective assistance of counsel, the Appellant bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2003). The Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), the Appellant must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id.* at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, *conclusions of law*, are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id*.

## I. Motion to Suppress

First, the Appellant asserts that trial counsel was deficient in failing to file a motion to suppress various items of evidence introduced at trial, particularly a Pilot receipt and currency which

were removed from his pocket at the jail. The Appellant argues that his arrest at the Mynders Avenue address was without probable cause, thus, all evidence obtained subsequent to his unlawful seizure should have been suppressed.

It is fundamental that, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *State v. Hughes*, 588 S.W.2d 296, 302 (Tenn. 1979) (quoting *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968)). Thus, the Fourth Amendment comes into play at the moment of the intrusion. *Id*. In the context of a "stop and frisk" or investigation stop situation, the rigidity of a Fourth Amendment analysis for probable cause is lowered, but a standard of specific and articulable facts remains. *Id*. Here, the Appellant's seizure did not constitute an investigative stop; rather, it was a "full blown" arrest resulting in his detention in a jail cell. The detective's statement at trial that the Appellant was "secured" and placed under arrest "for investigation purposes" is without legal foundation. In order to arrest without a warrant, which occurred in this case, probable cause is required. *State v. Jefferson*, 529 S.W.2d 674, 689 (Tenn. 1975). The Supreme Court in *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11 (1949), explained that "[p]robable cause exists where the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." (internal citations omitted). Thus, it is without dispute that a suspect may only be seized, secured, placed in custody, or arrested by the police when there is probable cause that the suspect has committed, or is in the process of committing, a crime. An arrest for "investigation purposes" falls under neither of these categories.

An examination of the proof in the record before us establishes that at the point of police "intrusion" or seizure, the police possessed knowledge of the following information: (1) that the description and license plate number of the vehicle used in the robbery matched the vehicle which was observed at the Mynders address, which was less than one mile away from the robbery scene; (2) that two male subjects were involved in the robbery, and two males were observed running from the vehicle used in the robbery into the residence at the Mynders address; (3) that each of the robbery suspects displayed a butcher knife during the robbery, and two butcher knives were observed at the residence in plain view, one on the porch and one in the vehicle; (4) that the Appellant was discovered hiding under a bed in the house; and (5) that Pilot receipts, coupons, checks made payable to Pilot, and coin wrappers, all items reported as stolen, were found in the driveway of the residence. It is abundantly clear from these facts, which were within the knowledge of the police at the time of the Appellant's arrest, that probable cause existed to arrest the Appellant for the crime of aggravated robbery. Accordingly, no prejudice is shown.

## II. Right to Testify

Next, the Appellant asserts that trial counsel was ineffective by "failing to explain and clearly establish that [the] Appellant was aware of his right to testify or not testify at his trial." According to the Appellant, he adamantly advised trial counsel that he wanted to testify in his own defense to establish an alibi for the time of the robbery. However, the Appellant stated that, based upon his

conversations with trial counsel, he believed that it was ultimately trial counsel's decision as to whether he would be called as a witness. The Appellant further stated that trial counsel repeatedly informed him that he was not going to be called as a witness because the State would be allowed to impeach his testimony with prior convictions if he took the stand. Trial counsel's testimony contradicted the Appellant's in that trial counsel testified that he did inform the Appellant of his right to testify in the case. Trial counsel acknowledged that he recommended that the Appellant not testify based upon the State's ability to use prior convictions but denied that he refused to allow the Appellant to take the stand, stating that he made clear to the Appellant that it was ultimately the Appellant's decision. Trial counsel stated that he "remember[ed] that [the Appellant] agreed in a sense or acquiesced" to his recommendation. Nonetheless, citing *Moman v. State*, 18 S.W.3d 152 (Tenn. 2000), the Appellant asserts that, indulging in every reasonable presentation against the Appellant waiving this fundamental right, the record "is abundantly clear that the Appellant did not waive his fundamental right to testify."

Initially, we are constrained to note that the procedure adopted by the Tennessee Supreme Court in *Momon* to ensure that a defendant has personally waived his right to testify has no application to this case. The Appellant's trial was held prior to our supreme court's holding in *Momon*, and the court in *Momon* expressly held that the procedures set forth "do not establish a new constitutional rule which must be retroactively applied," specifying that the procedure should be applied "in all cases tried or retried after the date of this decision." *Momon*, 18 S.W.3d at 162-63.

In its order denying relief on this issue, the post-conviction court accredited the testimony of trial counsel in finding that it was the Appellant's choice that he not testify at trial. On appeal, we will not reweigh or reevaluate a post-conviction court's credibility determinations. *Henley*, 960 S.W.2d at 578-79. The only contrary proof in the record was the Appellant's own self-serving statement that trial counsel had failed to adequately inform him of the right. Merely informing a client that it is in his best interest not to testify does not equate to a denial of the right. Accordingly, we conclude that there is nothing in the record to preponderate against the post-conviction court's denial of relief upon this ground.

## III. Defense Witness Effect During Rebuttal

Finally, the Appellant contends that trial counsel was deficient for calling Captain Dan Neubert to testify as it resulted in the State proving that R.L. Seaton was incarcerated at the time of the offense. During the course of the trial, the Appellant presented an identity defense, *i.e.*, that he was not the perpetrator of the crime. In support of this defense, trial counsel relied upon the victim's testimony that the two perpetrators were not similar in height or weight. Trial counsel suggested that a possible perpetrator might be R.L. Seaton, Webb's brother-in-law, who matched the description of the second perpetrator with regard to weight and height. However, during the direct examination of Detective Graves, the State asked if Graves knew Seaton's whereabouts on the night of the robbery. Graves responded that Seaton was in the Blount County Jail, at which point, trial counsel objected.

The only defense witness called was Captain Neubert whose sole testimony on direct examination consisted of establishing the height and weight of the Appellant and McBee. The State then proceeded to call Neubert as a rebuttal witness, and his rebuttal testimony established that Seaton was incarcerated in the county jail on the day of the robbery based upon the introduction of jail records. The Appellant argues that trial counsel was deficient in allowing the State to dispel the suggestion that Seaton was a participant in the robbery, as well as in failing to investigate Seaton's incarceration prior to offering him as an alternative suspect.

While we acknowledge that introducing evidence of "third-party guilt" in order to create reasonable doubt is a valid tactical strategy, we question trial counsel's use of such a third party who was incarcerated at the time of the crime and easily disproved as being the perpetrator. However, as the State points out, there is no suggestion that the defense strategy was to prove that Seaton was guilty; rather, the strategy was to introduce possibilities other than the Appellant's guilt. The record does not establish that trial counsel was relying solely upon the fact that Seaton was the person who committed the crime. Regardless, no prejudice resulted to the Appellant as a result of Neubert's testimony. Clearly, Detective Graves had already testified to the same information during the State's case-in-chief. Thus, we are unable to conclude that prejudice inured to the Appellant. This issue is without merit.

## CONCLUSION

Based upon the foregoing, the Blount County Circuit Court's denial of the post-conviction relief is affirmed.

_____
DAVID G. HAYES, JUDGE