# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 15, 2015 Session

## JERRY KEVIN DUKE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 87-F-1864     Mark J. Fishburn, Judge**

---

**No. M2014-01673-CCA-R3-ECN – Filed November 23, 2015**

---

The petitioner, Jerry Kevin Duke, appeals the denial of his petition for writ of error coram nobis, arguing that the statute of limitations should be tolled based on newly discovered evidence of new medical evidence and withheld exculpatory evidence of the child rape victim's inconsistent statements. The petitioner further argues that the newly discovered evidence may have resulted in a different verdict had it been presented at trial. Following our review, we affirm the judgment of the coram nobis court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Stephen Ross Johnson, Knoxville, Tennessee, for the appellant, Jerry Kevin Duke.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Katrin Novak Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

In 1987, the petitioner was indicted by the Davidson County Grand jury for two counts of aggravated rape of a four-year-old girl. A Davidson County Criminal Court jury found him guilty of aggravated rape in one count and of the lesser included offense of aggravated sexual battery in the other count, and the trial court sentenced him to concurrent terms of forty years and twenty years, respectively, for an effective sentence

of forty years in the Department of Correction. Our direct appeal opinion provides the following synopsis of the evidence presented at his May 1988 trial:

The victim was four years old at the time of the offenses. She and her parents were living in an apartment complex in Nashville. The [petitioner] and his family lived in the same complex. The [petitioner's] wife baby-sat for the victim four or five times during the summer of 1987.

On August 30, 1987, the victim was scheduled to go to the [petitioner's] apartment while her parents were at a cookout. The victim appeared upset on the way to the apartment but would not explain why. The [petitioner's] wife said the victim continued to act upset for a short time after her parents left but continued to refuse to explain why.

When the victim's parents returned to pick her up a few hours later the child seemed disturbed and complained of pain in the vaginal area. After questioning she told her parents the [petitioner] had touched her between her legs and it hurt.

The police were called and arrived a short time later. The victim told an officer the [petitioner] had touched her between her legs. The officer asked her if the [petitioner] put his fingers inside her and she said yes. She further reported the [petitioner] had done the same thing the last time she was at his home.

The victim was taken to a local hospital and was examined by a doctor. She repeated her story to the doctor although she did not mention the [petitioner] by name.

The victim became very upset during the physical examination and it became necessary to restrain her. Eventually the examination was terminated. The child was returned to the hospital the following day when a more complete physical examination was made.

Two separate doctors examined the victim. No tearing, bleeding or other manifestation of acute trauma was found. Examination of the hymenal ring revealed evidence of previous trauma consistent with abuse.

The child testified at trial and confirmed her original report. She identified the [petitioner] as the person who digitally penetrated her. On cross-examination she responded to questions designed to determine the

2

extent of pre-trial coaching by saying she had spoken to her mother about her testimony several times and said she really didn't remember what happened on the nights in question.

The [petitioner] offered proof through a third physician, who had not examined the victim but who had reviewed the examining physicians' reports. He found nothing abnormal about the findings except the size of the hymenal opening. He further said in his opinion digital penetration as described by the child should have caused more visible damage than found by the treating physicians.

The [petitioner] and his wife both testified about the events of August 30 and prior times the victim was in their home. Both said the [petitioner] was never alone with the victim on August 30 and in fact had virtually no contact with her at all. They both also said the [petitioner] was not present during the other times the victim was in their apartment.

State v. Jerry Kevin Duke, No. 89-74-III, 1989 WL 111204, at *1-2 (Tenn. Crim. App. Sept. 27, 1989), perm. app. denied (Tenn. Dec. 4, 1989).

One of the main issues the petitioner raised on direct appeal was the sufficiency of the evidence. Specifically, he argued that the evidence against him consisted primarily of the victim's testimony, which was so inconsistent that it should be disregarded. We rejected that argument, finding that the inconsistencies in the victim's trial testimony could be adequately explained by a number of factors, including the victim's young age, the manner of questioning, and the time that had elapsed since the offenses:

The [petitioner] says the only substantial evidence of his guilt is the testimony of the victim. He insists this testimony should be disregarded because she gave contradictory responses as to the critical elements of the offense.

The heart of this complaint is found in Hughes v. State, 588 S.W.2d 296 (Tenn. 1979), where our Supreme Court described "cancellation" of a witness'[s] testimony. Cancellation occurs when there are "contradictory statements of a witness in connection with the same facts." Id. at 301.

The rule set out in Hughes does not apply when the inconsistency in the testimony is explained and one version is corroborated by other evidence. See Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476 (Tenn. App. 1978). In the instant case the victim did not retract her

3

affirmative description of the offense or her identification of the [petitioner]. Instead, during a lengthy cross-examination she said she could not remember the events of the night in question.

When viewed in its entirety one thing is clear from the victim's testimony, she never wavered in her assertion that the [petitioner] digitally penetrated her on two occasions. Admittedly, this five-year-old child's concept of time was confused and she had difficulty maintaining her concentration during her testimony; however, her testimony on the central issue was not contradictory. Furthermore, the testimony of other witnesses, including the medical proof, corroborated the victim's testimony.

When weighed together the child's age, the nature of the offense, the time between the offense and the trial, the manner of questioning, and the overall content of the testimony adequately explains any inconsistencies. In addition, there was ample corroboration of the relevant testimony. This Court does not find this testimony to be sufficiently inconsistent as to require application of the cancellation rule.

Having found the victim's testimony to be proper there is ample evidence in this record to support the jury's finding of guilt beyond a reasonable doubt. This issue is without merit.

Id. at *2-3.

On December 17, 2012, more than twenty-three years after the judgment became final, the petitioner filed a petition for writ of error coram nobis in the Davidson County Criminal Court, alleging that "[n]ewly discovered evidence of the [victim's] inconsistent statements about how many times she was allegedly assaulted, coupled with newly discovered evidence showing that the [victim's] physical examination is normal under more modern and accurate medical standards, if presented to the jury, may have resulted in a different verdict at trial." The petitioner asserted that the University of Tennessee College of Law Innocence and Wrongful Convictions Clinic ("the Clinic"), which began to represent him on his innocence claim in August 2010, obtained from the District Attorney's Office in August 2011 the records of an interview that Department of Human Services ("DHS") caseworker Becky Herbert conducted with the victim in which the victim said that the petitioner touched her only one time. The petitioner alleged that the State withheld these records from the defense "at every stage of petitioner's challenge to his convictions."[1] The petitioner further asserted that Dr. Deborah Lowen, the Director

---

[1]Apparently, a copy of this statement had not earlier been provided to the Davidson County District Attorney General's Office.

of the Child Abuse Pediatrics Division at Monroe Carell Jr. Children's Hospital at Vanderbilt, who was asked by Clinic attorneys to review the case after they obtained the previously withheld DHS records, opined that under more accurate medical standards that were not available at the time of the victim's examination, the examining physician's "description of [the victim's] genital region is one of a normal examination." Finally, the petitioner asserted that due process required that the statute of limitations for filing the petition be tolled due to the fact that the State withheld the exculpatory evidence of the victim's inconsistent statements and "the current level of medical knowledge related to the genital anatomy of young girls was not available at trial."

The petitioner attached the relevant records as exhibits to his petition. The pertinent portion of Dr. Lowen's November 1, 2012 formal written opinion, in which she referenced email opinions she had provided to a law student in March 2011 and March 2012, reads as follows:

> In his written material as well as his court testimony, Dr. Wilson indicated that he felt the child's genital findings were abnormal and indicative of prior sexual abuse based on 2 specific features: the thickened/"rolled" appearance of part of the hymen, and the hymenal diameter estimated to be 8-10 mm. No photodocumentation was performed, so I have no independent knowledge of exactly what the child's genital anatomy looked like. However, reading his description of the examination and the diagrams Dr. Wilson made at the time, I feel that I have an adequate sense of what he is describing.
>
> In the 25 years since this child's examination, there has been a very significant increase in our level of knowledge related to the genital anatomy of prepubertal girls. In fact, the most important descriptive studies of normal anatomy and anatomy after sexual abuse were published starting in 1987, with the bulk occurring in the 1990's and 2000's. Since [the victim's] examination, we who practice in this field have learned that measurements of hymenal diameter are not useful in determining whether a child has or has not been sexually abused. We have also learned that a thickened or rolled area of hymen can be a normal variant and not related to sexual abuse or prior penetrating trauma. As such, Dr. Wilson's description of [the victim's] genital region is one of a normal examination.
>
> This being said, it is important to understand that a normal genital exam, without evidence of acute or chronic signs of trauma, is seen in the vast majority of cases of child sexual abuse. Therefore, a normal,

atraumatic examination neither proves nor disproves the possibility of child sexual abuse.

The pertinent portion of DHS caseworker Becky Herbert's investigative report reflects that "[the victim] said this happened 'one time.'"

The State responded to the petition by asserting the statute of limitations and arguing, *inter alia*, that neither the DHS records nor Dr. Lowen's report would have changed the outcome of the trial.

On October 4, 2013, the petitioner filed a "Supplement to Petition for Writ of Error Coram Nobis" in which he alleged that since the filing of his petition, Clinic attorneys had, in response to their request for discovery, uncovered additional new evidence of the victim's inconsistent statements regarding the incident, which would have provided further impeachment evidence to undermine the victim's credibility at trial. The petitioner cited the following evidence: (1) when asked by Investigator David Bradford of the Metropolitan Police Department how many times the petitioner had touched her, the victim held up one finger and said "one time"; (2) when asked by Investigator Bradford whether the petitioner told her not to tell anyone about the incident, the victim replied, "No[,]" yet when asked by Dr. Wilson whether the petitioner told her not to tell or to keep it a secret, she replied, "Yes"; and (3) the police evidence receipt and laboratory report of the rape kit and clothing from the victim revealed that the clothing collected from the victim was a red dress and panties, yet the victim testified at trial that she had been wearing brown pants and demonstrated that she had been molested through the zipper of the pants.

The victim's statement to Investigator David Bradford, which the petitioner attached to his supplement to the petition and which contains the signatures of the victim, the victim's father, and Investigator Bradford,[2] reads as follows:

This is a voluntary statement of [the victim]. . . . This statement was given to Investigator David Bradford of Youth Guidance Division of the Metro Police Department on Tuesday, September 1, 1987.

Q. [The victim], tell me what that man did to you.

---

[2]The petitioner emphasizes the fact that "one of the withheld reports is a typewritten statement *purported even to have been signed in cursive handwriting* by the four-year-old witness," which, he argues, further supports his position that the victim was "heavily coached and the allegations fabricated." Although there is no notation indicating that the father signed on the victim's behalf, the signature appears to be in the father's handwriting. There is nothing in the statement itself to indicate that either parent coached the child or answered on her behalf.

6

A. She pointed to her vagina and said that man put his finger in me.

Q. How many times did he do this?

A. She raised one finger and said one time.

Q. Did it hurt?

A. Yes[.]

Q. Did he tell you anything?

A. He told me to get in his lap.

Q. Did he put anything else inside of you?

A. No[.]

Q. Did he tell you not to tell anyone?

A. No[.]

Q. What was this man's name?

A. Jerry.

Q. Has he done this before, has he put his finger inside you?

A. Yes[.]

Q. How many times?

A. One time.

Q. Did he have his clothes off?

A. No.

Q. Has anybody else put their fingers inside of you besides Jerry?

A.  Jerry.

At the February 18, 2014 error coram nobis hearing, Attorney David Raybin, who represented the petitioner at the motion for new trial and on direct appeal, testified that the records uncovered by the Innocence and Wrongful Convictions Clinic were not in his file, which included the original complete case file of the petitioner's trial counsel.  He said he argued strenuously on appeal that because the victim's testimony on cross-examination was so inconsistent with her testimony on direct examination, the "cancellation rule was applicable" to her testimony, which would have then left "no evidence to convict [the petitioner]."  He stated that the victim's having told the DHS worker that the abuse occurred on only one occasion was evidence of "a material inconsistency in her testimony as to fact and directly contradict[ed] what the Court of Criminal Appeals used to counter [his] argument about the cancellation."  In addition, the police records that the victim was wearing a dress rather than pants at the time of the assault also showed a "material inconsistency" in the victim's testimony, which was, in his view, at least as important as her inconsistent accounts of the number of times the abuse occurred:

> The police records also reflect the clothing that she wore, and I didn't notice that until I looked at some of the pleadings.  That to me is as important as the fact that there were one occasion versus two, because the clothing that she wore that night was an issue at trial and was discussed at some length.  And the doctor's report testified that she's wearing a dress at the time this happened, but her testimony was it was like a zipper or something that [the petitioner] had to get into to molest her.
>
> So that dealt with the physical dynamics of how this thing occurred, dress versus zipper or something like that.  And that is in my view at least if not more profound in the fact that it occurred on one versus two occasions or two versus one.  So you have material inconsistency there and the physical dynamics of how this happened and not just -- what occurred.  So those things are -- had I known that at the time, I absolutely would have raised that, both issues at the time.

On cross-examination, Mr. Raybin acknowledged that he and trial defense counsel had in their file a description of the clothing the victim was wearing, as well as a police report reflecting that the victim disclosed only one instance of abuse in an interview with one of the police officers.  He conceded that DHS caseworker Herbert's report included her statement that the victim, during the interview, kept "avoiding [her] questions and running and getting some toys to play with."  He also acknowledged that the victim's disclosures to the physician and the police detective that the abuse happened

8

more than once were in response to their direct questions and that the victim never said to anyone that nothing had happened. Finally, he acknowledged that the petitioner was convicted of a lesser included offense in one count and received concurrent sentences for the convictions. He believed, however, that the defense should have been able to impeach the victim's credibility with all her various inconsistent accounts, which might have led the jury to acquit the petitioner of all charges:

> Okay. The answer to the question is, I wasn't going after one conviction. That would have been almost irrelevant since he got 40 years after both of them. My position was he wasn't guilty of any of this. So simply, because there may have been evidence to describe from one of the offenses, of course the question would have been which one, that's not the question. That's not the issue I was litigating, and it's not why I feel that this is exculpatory.

> This went to whether [the petitioner] committed any crime or not. This is not a technical deficiency in one count where it doesn't make any difference, because he got concurrent time like if it had been some defect in the judgment. In my view, this went to credibility of the alleged victim as to whether anything occurred, so that he shouldn't have been in my view – restate this. The jury should have known all the evidence regarding these inconsistencies so that the credibility of the victim could have been determined in its fullness.

> And had that been done and reviewed, there would have been a reasonable probability that he would have been convicted of nothing. That's the point, and that's what I would have approached in the motion for new trial and on appeal had I been privy to this information.

Judge Phillip Robinson testified that he was currently Judge of the Third Circuit Court, 20th Judicial District, Davidson County, but had previously been in the private practice of law and represented the petitioner from the pretrial proceedings through the trial. He said that, to his knowledge, none of the materials attached to the petition for writ of error coram nobis was included in the discovery he received from the State or in the materials he had in his case file. He stated that the victim's "credibility was the most important factor" and that he "absolutely would have" used the withheld materials had he had access to them at trial. On cross-examination, he testified that the State's expert witness's testimony that the victim's physical examination showed evidence of past trauma consistent with sexual abuse "bolstered the child's testimony," which, in his opinion, led to the petitioner's conviction. He said he presented an expert witness who agreed that the victim's physical examination was "abnormal" but disagreed that it

necessarily evidenced past sexual abuse. Had he had access at trial to Dr. Lowen's report that the victim's examination was normal under current medical understanding, there would not have been any evidence of physical trauma to bolster the victim's testimony.

Judge Robinson acknowledged that the victim was consistent in her statements that she had been abused. He further acknowledged that he conducted an effective cross-examination and succeeded in getting her to admit that she could not remember the night in question or any of the abuse.

Among the exhibits to the hearing was the affidavit of former DHS caseworker Rebecca Herbert Cheney, who stated that, according to her notes, she did not specifically ask the victim if the petitioner touched her more than one time. She further stated that, because of the victim's age, she "was satisfied to get the one disclosure of sexual abuse."

On August 21, 2014, the coram nobis court entered a detailed written order denying the petition. Noting Dr. Lowen's formal written opinion that "'the most important descriptive studies of normal anatomy and anatomy after sexual abuse were published starting in 1987, with the bulk occurring in the 1990's and 2000's,'" the court found that due process considerations did not justify tolling the statute of limitations with respect to the "purported newly discovered medical evidence." With respect to the "impeachment evidence," the court found that the State's failure to disclose the inconsistencies in the victim's accounts tolled the statute of limitations. However, after considering the claims on their merits, the court concluded that there was not a reasonable probability that the impeachment evidence would have resulted in a different outcome to the case,[3] finding that it did "little to add to the mix" of the "fairly significant amount of [inconsistent or impeachment] evidence" that was presented at trial. The court also noted that "the cancellation rule" applies only to sworn statements and thus would be "inapplicable to the present case, despite the newly discovered inconsistencies."

## ANALYSIS

The petitioner argues that he was without fault in failing to present the new medical evidence within the applicable limitations period because Dr. Lowen did not complete her formal report until November 2012, after Clinic student attorneys provided her with the newly discovered DHS records of the case. The petitioner acknowledges Dr. Lowen's statement that the bulk of the new medical findings were published in the 1990s

---

[3]The petitioner points out that the coram nobis court "employed an incorrect standard" of whether there was a reasonable probability that the result would have been different had the new evidence been presented at trial. The petitioner acknowledges, however, that the court cited the correct standard in the beginning of its order. We think the erroneous "reasonable probability" language used by the court was simply a mistake in the wording of its order.

and 2000s but argues that "[i]t would be unreasonable to expect [the petitioner] to follow scholarly medical advances while indigent, unrepresented, and in the custody of the Tennessee Department of Correction[]." The petitioner further argues that the new medical evidence that the victim's genital examination was normal, combined with the new evidence of the victim's inconsistent statements, "significantly alters the quantum of proof in his favor" and may have led to a different outcome at trial.

The State argues, *inter alia:* that due process tolling is improper with respect to the allegedly newly discovered medical evidence because Dr. Lowen's opinion is not later arising and the petitioner did not file his claim within a reasonable time; that the claims regarding the new DHS records should have been dismissed as time-barred because the petitioner waited sixteen months from receipt of the records to file his petition; and that the coram nobis court properly exercised its discretion in dismissing the remaining claims regarding the newly discovered police records because there was no reasonable basis to conclude that they would have changed the outcome of the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Our supreme court has stated the standard of review is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." State v. Vasques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted). "If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result." Id. at 527-28. The decision whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial

11

court.   Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010) (citing Vasques, 221 S.W.3d 514 at 527-28).   "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." State v. Wilson, 367 S.W.3d 229, 235 (Tenn. 2012).

Petitions for writ of error coram nobis are subject to a one-year statute of limitations.  Tenn. Code Ann. § 27-7-103 (2010); Harris, 301 S.W.3d at 144.  The one-year statute of limitations, may, however, be tolled on due process grounds if the petitioner seeks relief based upon newly discovered evidence of actual innocence. Wilson, 367 S.W.3d at 234. In determining whether tolling is proper, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless.  Harris, 301 S.W.3d at 145 (citing Workman v. State, 41 S.W.3d 100, 102 (Tenn. 2001)). Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner."  Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992). The Burford rule consists of three steps:

(1) determine when the limitations period would normally have begun to run;

(2) determine whether the ground for relief actually arose after the limitations period would normally have commenced; and

(3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).  Whether a claim is time-barred is a question of law, which we review *de novo*.  Harris, 301 S.W.3d at 145 (citation omitted).

## A.  New Medical Expert Opinion

The petitioner contends that the coram nobis court erred in dismissing the newly discovered medical evidence claim as time-barred because the medical evidence was "not yet fully developed and accepted in the medical community" at the time of his trial and Dr. Lowen did not issue her formal written opinion until November 7, 2012, after she had reviewed previously withheld DHS records.   The petitioner asserts that he "was unrepresented for many years after his appeal for petition for federal *habeas corpus* relief and his subsequent appeal to the Sixth Circuit Court of Appeals, which took place in

1991 and 1993, respectively[,]" and argues that it would be unreasonable to hold him responsible for not following medical advances while he was indigent, incarcerated, and without representation.

We conclude, however, that the coram nobis court properly dismissed the petition on the basis of the alleged newly discovered medical opinion evidence. First, we agree with the State that Dr. Lowen's new medical opinion is not later arising. Dr. Wilson, the physician who examined the victim, testified at trial that he found no signs of acute or recent trauma but that the victim's reported history of recent sexual abuse, combined with the fact that her hymenal ring was larger than expected for a child of her age and was "thickened and rolled" in the upper portion, caused him to conclude that "it did appear as though some abuse had occurred in the past." The State's rebuttal expert, similarly, concluded that, when viewed in light of the victim's reported history of sexual abuse, the appearance of the victim's hymenal ring, with its larger than average opening and rolled border, was "consistent with some past penetration at some time." The petitioner's medical expert, on the other hand, testified that a rolled or thickened border could occur naturally and that the size of the victim's hymenal opening, although "[a] little bit" unusual, was "a variation of normal." Thus, Dr. Lowen's "new" medical expert opinion that the victim's physical examination was normal was already offered by the petitioner's medical expert witness at trial.

Even if the allegedly new medical expert evidence were later-arising, we conclude that the coram nobis court properly found that it was barred by the statute of limitations. According to Dr. Lowen's report, the "most important descriptive studies . . . were published starting in 1987, with the bulk occurring in the 1990's and 2000's." The petitioner's trial took place in May 1988, after the "most important descriptive studies" had begun to be published, and he continued to be represented during at least the earliest part of the time when "the bulk" of the studies were occurring. Furthermore, as the State points out, Clinic attorneys first obtained Dr. Lowen's email opinion, which consisted of a shortened, more informal version of her written letter, in March 2011.[4] We agree that it is clear from Dr. Lowen's formal written letter that the additional DHS records she received in the interval between her informal email and her formal letter were not material to the formation of her opinion, which was based on the medical records and

---

[4]Dr. Lowen's email opinion reads as follows:

I have reviewed the information you sent me. Basically, the state's witnesses testified based on the state of knowledge of prepubertal genital anatomy in the early 80's -- obviously (and as one would hope!) our knowledge has increased significantly over the past 30 years. The description of the child's examination is one of a normal child without abnormalities. I wish photos had been taken, but according to the testimony, none were. HOWEVER, a normal exam does not in any way rule out the possibility of child sexual abuse and is, in fact, the expected finding.

13

medical testimony at trial. Thus, assuming, *arguendo*, that the petitioner could not have discovered with due diligence the "new medical expert opinion" evidence earlier, he could at least have raised it as early as the spring of 2011, when he first received Dr. Lowen's opinion. The petitioner is not, therefore, entitled to error coram nobis relief on his new medical evidence claim.

## B. DHS and Police Records

The State argues that the petitioner's claim regarding the new DHS records is also time-barred because he waited an unreasonable amount of time after his receipt of the records to file his petition. The State further argues that the remaining claims regarding the newly discovered police records do not entitle the petitioner to error coram nobis relief because there is no reasonable basis to conclude that they might have altered the outcome of the trial.

As an initial matter, we agree with the State that the petitioner's claim based on the newly discovered DHS records should have been dismissed as untimely. The record reflects that the petitioner received the new DHS records on August 23, 2011, almost sixteen months before he filed his petition for writ of error coram nobis. The petitioner argues in his reply brief that "[t]he investigation required extensive time, as the record [in the petitioner's] case is almost three decades old and nearly two thousand pages long." He also points out that Clinic attorneys were providing the DHS and other records to Dr. Lowen for her review, and waiting for her formal written opinion, during this time. The newly discovered DHS records, themselves, however, comprise less than fifty pages of the record and are not complicated. Moreover, Clinic attorneys had already received Dr. Lowen's medical opinion about the physical examination in the email she sent in March 2011. Under the facts presented in this case, the petitioner's almost sixteen-month delay in filing his claim based on the newly discovered DHS records was unreasonable.

Regardless, we agree with the State that there is no reasonable basis for concluding that the results might have been different had the newly discovered DHS and police records been presented at the petitioner's trial. As the coram nobis court noted, there was already a significant amount of inconsistent and impeachment evidence presented at trial. The jury, for example, heard testimony from the victim's mother and the petitioner's wife that the victim was wearing a red dress on the night she disclosed the abuse, yet the victim testified at trial that she was wearing brown pants. The jury was also able to see that the victim, at several points during her testimony, turned to her mother to seek assistance with her answers. The victim, additionally, admitted at various points that she could not recall what had happened and that she had spoken with her mother and the prosecutor about her testimony.

The victim, however, never wavered in her assertion that the petitioner had molested her. In the face of a thorough and vigorous cross-examination, the victim acknowledged that she did not remember what took place at the petitioner's house. However, when asked, "And, in being honest with everybody, and being truthful, [the petitioner] never put his finger in you, did he?" she replied, "Yeah, he did." She then went on to testify that she was sitting in the petitioner's lap in the living room of his house while his wife was asleep in her bedroom and his daughter was asleep in her crib, and that she was wearing "girl, brown pants," and pink tennis shoes. When asked how the petitioner had accessed her vagina, she demonstrated that he went through the zipper of her pants.

Defense counsel attempted to get her to admit that she had been touched by a young boy whom her mother had babysat, but the victim was adamant that the petitioner was the one who touched her:

Q. And sometimes Brian would touch you and you touch Brian, do you remember that?

A. (Witness responds in the negative.)

Q. You don't remember anything like that. Did y'all ever play doctor?

A. I don't ever touch him.

Q. I'm sorry?

A. I don't touch him.

Q. You don't touch him. Did he touch you?

A. No.

Q. He never touched you?

A. Huh-uh (no).

Q. Who else touched you down between your legs?

A. No one.

Q. No one else touched you?

15

A. That's right. Only Jerry did.

Later, defense counsel attempted to get her to admit that a babysitter, Cary, had touched her:

Q. Okay. Now, you remember that Cary touched you?

A. No.

Q. Cary never touched you?

A. Huh-uh (no), they're good baby sitters.

Q. Oh, they're good baby sitters. What makes a baby sitter --

A. They're nice.

Q. They're nice?

A. Uh-huh (yes).

Q. You didn't like Jerry before you started baby-sitting with him, did you?

A. Uh-huh (yes).

Q. Huh? You did like him? Do you remember –

A. No, I don't.

Q. I'm sorry?

A. I said I don't.

Q. Oh, you don't like him. You didn't like him even before all this happened, did you?

A. Huh-uh (no).

Q. Why didn't you like him?

A. Because I just don't.

Q. Huh?

A. Because of the way he put his finger in me.

Q. Okay. That's why you don't like him now. Did you not like him before then? You need to speak into the microphone here, [the victim].

A. I said, no.

Q. You never did like him, did you?

A. No.

Thus, although the victim acknowledged at points that she could not remember the incident, she remained adamant throughout her testimony that the petitioner, and the petitioner alone, was the one who touched her. She was also adamant that the petitioner did not merely rub her vagina but "[s]tuck his finger in [her]." When asked whether "[i]t just happened one time, didn't it?" she held up two fingers to indicate two times. She acknowledged, though, that she did not remember the other time.

We agree with the coram nobis court that the newly discovered evidence of the victim's inconsistent accounts to the DHS caseworker and the police detective would have "added little to the mix" of the inconsistent and impeachment evidence the jury heard at trial. "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record, or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial, will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced, would not have resulted in a different judgment." State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted). It would have been obvious to the jury that the five-year-old victim was inconsistent in some of the details of the abuse, was unclear in her memory, and had been rehearsed in some of her testimony by her mother or others. There is no reasonable basis to conclude that evidence that the victim gave an ambiguous statement to police about how many times the petitioner had penetrated her, that she disclosed only one instance of abuse in her distracted interview with the DHS caseworker, or that she gave conflicting answers to leading questions about whether the petitioner told her not to tell anyone, might have led to a different verdict.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the coram nobis court denying the petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE